**STATE OF VERMONT**
**ENVIRONMENTAL COURT**

|  |  |  |
|---|---|---|
| | } | |
| **In re: Mansfield Professional Building** | } | Docket No. 260-11-07 Vtec |
| **PRD Final Plat Application** | } | |
| | } | |

## Decision on Motion for Summary Judgment

This appeal arises out of a decision of the City of Burlington Development Review Board ("DRB"), denying Appellant-Applicant Springlet, Ltd.'s ("Springlet") planned residential development ("PRD") application. The DRB had previously issued preliminary plat approval for Springlet's proposed PRD. Springlet then applied for final plat approval, which the DRB denied. It is from that rejection that Springlet appealed, thereby presenting Springlet's PRD application to this Court for review.

Now pending before the Court is Springlet's motion for summary judgment. In its supporting memorandum and other filings, Springlet suggests that it is entitled to summary judgment upon each of the five issues it preserved for our review in this de novo appeal. The City of Burlington ("City") opposes summary judgment on each of the issues Springlet raises. We address each of those legal issues in this Decision.

Springlet is represented in this proceeding by Ross A. Feldmann, Esq. The City is represented by Kimberlee J. Sturtevant, Esq. Interested Person Lori J. Lewis is an attorney and represents herself. Interested Person Old Sawmill Homeowner's Association, Inc. appeared and was represented by Liam L. Murphy, Esq. and Duncan R. McNeill, Esq., but withdrew its appearance on May 6, 2008.

## Factual Background

Springlet has organized its V.R.C.P. 56(c)(2) Statements of Undisputed Facts by grouping facts as they relate to the DRB's five bases for denial: (1) density; (2) exterior building materials; (3) concealment of structured parking; (4) impact upon the character of the area affected; and (5) front yard setbacks.[1] See Springlet's Attach. A to its Statement of Undisputed Facts at 12 (containing a copy of the appealed-from DRB Decision ("DRB Decision")). The City's Statements of Undisputed Facts also follow this pattern, and we adopt the parties'

---

[1] Similarly, the five Questions in Springlet's Statement of Questions mirror the DRB's five bases for denial.

organizational structure in our recitation of the facts. For the purposes of this motion alone, we note that the following facts appear to be material and undisputed, unless otherwise noted.

**Project Overview**

1. Springlet wishes to construct its proposed 34-unit planned residential condominium development, with associated structured parking, on a .74±-acre lot located at 183 St. Paul Street in Burlington.

2. The subject property is located in the Residential High Density Zoning District ("RH District"), which "is intended primarily for high density residential development in the form of duplexes, apartments, and/or planned residential developments." City of Burlington Zoning Ordinance ("Ordinance") § 3.1.4(c).

3. A pre-existing commercial building already exists on the subject property. The record currently before us does not detail the nature of the commercial development or its use, the exact size of the existing commercial structure, nor the portion of the .74±-acre lot it encompasses. However, the parties agree that the commercial structure equates to 16 residential units, for purposes of computing density.

4. The proposed PRD building is to be constructed on an area of the lot now occupied by the surface parking area for the existing commercial structure. A commercial loading dock for the existing structure will be demolished to make way for the new PRD structure. Otherwise, the commercial and PRD structures will be two separate buildings on the .74±-acre lot. As such, the PRD structure does not represent a reuse of the existing commercial structure. Rather, the PRD structure will be in addition to the commercial structure.

5. On July 27, 2007, the DRB issued its Minutes/Findings of Fact on its preliminary plat review of what was then Springlet's 33-unit PRD project. Subject to several conditions announced in its Findings, the DRB granted preliminary plat approval for the project as then proposed.[2] Springlet has provided the Court with a copy of the July 27, 2007 DRB Minutes/Findings of Fact as Attachment C to its initial summary judgment memorandum.

---

[2] The July 27, 2007 DRB Minutes/Findings note that Springlet's preliminary plat review request is also subject to "Sec. 28-7(a)(1) of the Subdivision Regulations." The City provided a copy of its Subdivision Regulations as Attachment A to its opposition memorandum to the pending summary judgment motion.

**Conformance to Density Requirements (Statement of Questions (SOQ) #1)**

6. When computing overall density on the entire .74±-acre lot, both parties initially concluded that the completed development will have the equivalent of 68 residential units per acre, after adding the proposed 34-unit PRD to the pre-existing commercial structure's equivalency of 16 residential units.[3]

5. Ordinance § 5.2.1 generally establishes density maximums in several zoning districts, including the RH District, where the general density maximum is 40 residential units per acre. Residential density in the RH District may be increased to up to 92 units per acre, provided that it qualifies as an "adaptive reuse" of an existing non-residential structure or property under Ordinance §§ 5.2.6(b)(3) and (4).

6. Springlet applied for final plat approval for its proposed project, claiming that it was entitled to an increase in the density maximum as an "adaptive reuse" development, pursuant to Ordinance § 5.2.6(b)(4).

7. The DRB denied Springlet's request for final plat approval on November 16, 2007. DRB Decision at 12. One of the five reasons the DRB gave for denying Springlet's application was that "[t]he proposed development [was] too dense in too small an area, resulting in conditions that exceed the provisions of adaptive reuse under Article 5." Id.

8. Springlet notes, and the City does not dispute, that the DRB considered Springlet's proposed project to be an adaptive reuse "as it entails residential construction on an existing nonconforming commercial property in the RH zone." Id. at 1.

**Appropriateness of Proposed Exterior Building Materials (SOQ #2)**

9. Pursuant to Ordinance § 5.2.6(b)(4), certain adaptive reuse projects must receive approval under the conditional use and other conditional review standards detailed in subsections (A) through (H), inclusive. The parties do not dispute that the subject property is within the portion of the RH District that must comply with the additional review standards announced in Ordinance § 5.2.6(b)(4).

---

[3] The parties use the following calculation: 50 units ÷ 0.74 acres = 67.57 units/acre. "In calculating the number of residential units permitted . . . fractional units of five-tenths (0.5) or greater shall be rounded up to the nearest whole number." Ordinance § 5.2.3. Thus, the parties agree that this project would have a density of 68 units per acre. The City argues in its legal memoranda that density should actually be calculated based upon only the acreage occupied by the structures. We address this legal argument in the Discussion section of this Decision.

10. Under Ordinance § 5.2.6(b)(4)(D), any new structure requiring an exemption to the density maximums, pursuant to § 5.2.6(b)(4), and "utilizing the height bonus provisions as specified under [§ 5.2.6(b)(4)(A),] shall be constructed of quality masonry materials or other comparable materials of similar durability on all elevations" (emphasis added). The parties agree that Springlet's proposed 34-unit PRD has structural characteristics that require conformance with Ordinance § 5.2.6(b)(4)(D).

11. An earlier version of Springlet's application incorporated vinyl siding into the building's design, but that design concept has been replaced. Springlet now proposes to incorporate eight inch by eight inch concrete masonry unit (CMU) blocks in the front façade and into portions of the exterior side walls.

12. In addition, an earlier version of the application incorporated exterior square paneling. The application as last revised incorporates factory-finished metal siding along portions of the exterior walls from the second to fifth floors. The PRD building is proposed to be five stories tall.

13. Springlet appealed the specific DRB determination that its proposed project's exterior building materials failed to satisfy the requirement that they be "quality masonry or of similar durability" under § 5.2.6(b)(4)(D). DRB Decision at 12.

14. The City disputes Springlet's assertion that the proposed factory-finished metal siding is of a quality comparable to "high quality masonry," per Ordinance § 5.2.6(b)(4)(D).[4] The City, through an affidavit from its registered professional architect, Ann Vivian, offered expert opinion evidence that the metal siding proposed for portions of the exterior walls is not as durable as high quality masonry and is more susceptible to corrosion and denting. Affiant Vivian asserts that factory finished metal siding is "expected to perform well for up to 15 to 20 years. In contrast, masonry [siding] can easily last a hundred years with minimal maintenance." Vivian Aff. at p. 5. Springlet offers criticism of the City's assessment of the durability and longevity of the proposed metal siding, and relies upon the sworn statement from its own architect, Michelle Dufresne. Springlet suggests that because the metal siding will not be installed below the second floor of the proposed PRD structure, "it is therefore not susceptible to denting." Springlet Supplemental

---

[4] The parties have provided two different versions of the Ordinance. Compare Springlet's Attach. 1 to Mot. for Summ. J. (containing selections from the Ordinance), with the City's Ex. C (containing a complete, but undated, copy of the Ordinance). The parties have neither explained which version is applicable to Springlet's application nor noted any difference between these versions of the Ordinance. We have not noted any material differences that are relevant to our review of Springlet's pending summary judgment motion.

4

Mem. at 8.  We have not found the evidentiary foundation for this assertion in the record now before us.

15.     Springlet and the City agree that CMU blocks, such as those that Springlet proposes to use in its PRD project, are a common construction material.  The City, through its architect, expresses concerns that CMU blocks may lack the aesthetic quality of fired clay bricks, such as those on the exterior walls of surrounding buildings, unless the CMU blocks are "specified with a specialty color and texture (eg: honed, glazed, pigmented with color, special aggregate, etc.) and in its installation incorporate detailing to diminish the uniform and unfinished concrete look of the [CMU] material.  In contrast, a common CMU wall will appear monolithic and similar to unfinished concrete from a distance."  Vivian Aff. at p. 5.  Springlet's architect has offered a contrary expert opinion about the quality and durability of the CMU blocks proposed to be used.  Dufresne Aff. at ¶ 9.

16.     The City also notes that the development's exterior includes elements of concrete which do not rise to the level of "high quality masonry" required by Ordinance § 5.2.6(b)(4)(D).

**Concealment of Proposed Structured Parking (SOQ #3)**

17.     Springlet proposes to address parking needs on its site with an enclosed parking structure incorporated into its PRD building.  One of the additional conditions for an adaptive reuse project under Ordinance § 5.2.6(b)(4) requires that "any structured parking shall be concealed by the structure of the building so that it is not visible from the street," other than the parking entrance and exit.  See § 5.2.6(b)(4)(E)(4).

18.     Springlet provided a computer rendering of its proposed PRD building[5] which partially depicts the parking area within the structure.  This computer rendering shows views of cars within the structured parking.

19.     Springlet proposes to screen the southerly end of the project's structured parking with a seven-foot tall concrete slab wall.  It is unclear from the record currently before the Court whether the proposed concrete slab wall will completely conceal the proposed parking areas within the structure from all street vantage points.

20.     The entrance and exit from Springlet's structured parking would be onto St. Paul Street, which is easterly of the proposed development.

---

[5]  See Attach. B to Springlet's Supplemental Statement of Undisputed Facts, filed with the Court on April 25, 2008.

21.     The City disputes Springlet's assertion that the concrete slab wall for the structured parking adequately conceals it. Conceding that the "7' high exposed cast-in-place concrete wall directly adjacent to the sidewalk . . . will visually conceal cars parked behind it," at least for people walking on the sidewalk immediately adjacent to it, the City's architect provides expert opinion evidence that the concrete wall "will not do so in an adequate fashion, for while the passing pedestrian may or may not be aware of parked cars, he or she will certainly be aware of such a massive expanse on [sic] unattractive concrete, and the lack of habitable 1st floor space." Vivian Aff. at p. 5.

**Impact Upon the Character of the Area Affected (SOQ #4)**

22.     Any proposed PRD in the RH District that is intended to rely upon the maximum density exemptions of Ordinance § 5.2.6(b)(4) must also show that it does not adversely affect the character of the surrounding area,[6] with an additional requirement that "where there are conflicts between public uses and activities and the quiet enjoyment of residents in [the proposed] development[], . . . the public uses and activities shall take precedence and the development shall be designed in a manner that mitigates the conflicts." Ordinance § 5.2.6(b)(4)(H).

23.     Springlet has provided several examples of approved developments that have some characteristics similar to its proposed project, including exterior building materials and the manner in which structured parking is concealed. All of the examples cited by Springlet are nearby its proposed project, although none appear to be adjacent to its proposed project and one or more may be in a different zoning district.

24.     The parties dispute what constitutes the "area affected." The City appears to rely upon an analysis of adjacent properties and Springlet appears to focus upon approved developments that may be within a block or more of its proposed development.

25.     Within the context of the City's focus upon the most immediate properties to the proposed development, the City notes that Springlet's proposed project would place a building exceeding five stories where its most immediate neighbors consist of one- and two-story buildings; that Springlet's project would be unique in its immediate neighborhood as to the density of the existing commercial units and proposed residential units; and that the Springlet project otherwise deviates from the existing development patterns established in its immediate

---

[6] Pursuant to Ordinance § 17.1.5(a)(2), as required by Ordinance § 5.2.6(b)(4)(H).

6

neighborhood. Based upon these assertions, the City suggests that Springlet's project is out of character with the area affected and makes inadequate provisions to mitigate conflicts with the surrounding area.

**Conformance to Front Yard Setback Requirements (SOQ #5)**

26.     Springlet's existing commercial structure is situated at or over the municipal right-of-way for one or more of the adjacent roadways; there is no setback area from the existing commercial structure and the adjacent roadways.

27.     Springlet's proposed PRD structure will also be built adjacent to the adjoining roadways, such that no setback will exist.

28.     Springlet's existing commercial structure is 30 feet high from the adjacent roadway. Its proposed PRD structure would have a general height of 55 feet and, at the highest point of its roof arch, a height of 61.5 feet.

## Discussion

Before analyzing the substance of Springlet's motion, we must first address several issues related to the scope and nature of this appeal, and the perspective on those legal issues that the pending summary judgment motion requires.

First, we note that summary judgment is only appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, referred to in the statements required by Rule 56(c)(2), show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3). When considering a motion for summary judgment, we must give the non-moving party the benefit of all reasonable doubts and inferences. Mooney v. Town of Stowe, 2008 VT 19, ¶ 5 (mem.).

Second, in this de novo proceeding, our role is to apply the substantive standards that were applicable before the DRB. 10 V.S.A. § 8504(h); V.R.E.C.P. 5(g). Our authority in this appeal is as broad as the DRB's, but not broader. In re Torres, 154 Vt. 233, 235 (1990). In this appeal, "whatever the [DRB] might have done with an application properly before it, [this Court] may also do . . . ." Id. at 236. We will proceed on all questions of law and fact as though the DRB had taken no action on Springlet's application. See V.R.E.C.P. 5(g) (providing that unless an appeal is taken "on the record" under V.R.E.C.P. 5(h), all appeals "shall be by trial de novo"); and see Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 11 (1989) ("A de novo trial 'is one where the

case is heard as though no action whatever had been held prior thereto.'" (quoting In re Poole, 136 Vt. 242, 245 (1978))).

Springlet's several references to earlier municipal "sign-offs" must also be placed in their proper context. Much like the DRB is allowed to receive recommendations from municipal department heads on issues relevant to final plat approval, this Court is entitled to receive such recommendations and afford the appropriate weight to them when rendering its determinations. But we know of no legal authority for the proposition that recommendations from municipal officials are binding upon a DRB in the first instance, and therefore do not regard such recommendations to be binding upon this Court in the second instance. To the extent that such recommendations are uncontested and address a material issue in this appeal, we may rely upon them. To the extent that such recommendations are in conflict with other evidence presented in the record now before us, we await the opportunity to afford the appropriate weight to such competing evidence when presented at trial.

The parties have also noted whether preliminary and intermediate municipal site plan approvals can create finality that precludes later review and different conclusions in the final site plan approval proceedings. In this regard, we apply the logic from this Court's prior decision in In re Simpson Development Corp., No. 54-3-05 Vtec, slip op. at 3-4 (Vt. Envtl. Ct. Jun. 27, 2006) (Durkin, J.), with some caution, as that decision was followed by the Supreme Court decision that, while in a different case, addressed a related legal issue. In its decision on In re Appeal of Carroll, 2007 VT 19, ¶ 16, 181 Vt. 383, our Supreme Court noted that when a municipal panel engages in preliminary and final plat reviews, it is "essentially" engaged in "one proceeding." We do not regard Carroll as an explicit rejection of the rationale this Court relied upon in Simpson. Rather, we caution that prior preliminary plat determinations may only bring finality on the general conceptual aspects of a proposed project and not foreclose the review that may properly occur in the course of final plat review. We further note that where preliminary plat approval is issued with conditions, such conditions may be further refined in the final plat approval process.

Lastly, we note that the parties have included what appear to be two different versions of the Zoning Ordinance. Compare Springlet's Attach. 1 to its Mot. for Summ. J. (containing selections from the April 2005 Ordinance) ("2005 Ordinance"), with the City's Ex. C (containing a complete copy of the Ordinance). As a general rule, we apply the zoning ordinance that was in

8

effect when an applicant made its application, as zoning rights vest at the time of the filing of a complete application. See In re Jolley Assocs., 2006 VT 132, ¶ 11, 181 Vt. 190.

Springlet submitted its application on August 22, 2007. The Ordinance version Springlet has offered is dated April 2005. The City has offered a version that does not contain a cover page indicating its effective date, unlike Springlet's version. Instead, it explains that "[a]mendments to the ordinance are indicated by parenthetical history notes following the amended provisions. The absence of history notes indicates that the provision remains unchanged from the original ordinance [that became effective on April 11, 1994]." Review of the City's version of the five Ordinance sections Springlet has preserved for our review, Ordinance §§ 5.2.6(b)(4), 5.2.6(b)(4)(D), 5.2.6(b)(4)(E)(4), 5.2.6(b)(4)(H), and 5.3.13, reveals that these sections either were not amended from the original ordinance, or they were amended after April 2005 but before Springlet submitted its application. Therefore, we rely upon the version of the Ordinance offered by the City, as it appears to be the version in effect at the time Springlet made its application.[7]

We now address the substantive legal issues raised by the parties' memoranda, which incorporate all five Questions that Appellant Springlet has preserved for our review in this appeal.

## Question 1: Article 5 Density Requirements

Springlet proposes in its pending motion that it is entitled to summary judgment upon its Question 1, which asks whether its project meets the Article 5 density requirements. The parties agree that Springlet's application proposes a project that would have a total density equivalent of 68 units per acre. The City contends, however, that because the configuration (or footprint) of this project would place all of the proposed units on only a portion of the lot, density should be calculated based only upon that portion of the lot that the new development occupies. If we were to adopt the City's formula for computing the density of this development, we would arrive at a density equivalent of 180 units per acre, thereby exceeding even the highest density allowed under Ordinance § 5.2.6(b)(4). Because we find no support in the Ordinance for the computation formula espoused by the City, we decline to adopt it.

We note that in its Supplemental Memorandum in Opposition to Summary Judgment (filed June 5, 2008), the city characterizes its density concerns as pertaining to "a qualitative

---

[7] Accordingly, our references to the Ordinance hereafter shall also be to the City's Ex. C.

analysis that is germane to the character of the area and how the project relates to its environment pursuant to" Ordinance §§ 17.1.5 and 6.1.10(a). Id. at 2. The City complains that by placing all its proposed residential units on only a small portion of an admittedly small lot, Springlet has proposed an "unnecessarily accentuated" project design. Id. Springlet objects to this characterization and asserts that the Court should ignore the City's objections, at least within the context of compliance with the density maximums of § 5.2.6(b)(4). We agree, as it appears that even the City agrees that its concerns are raised within the context of Appellant's Question 4. We therefore address the applicability of the City's concerns in that section below.

Springlet's lot is located at 183 St. Paul Street and it is therefore located within the area "bordered on the north by Main Street, on the south by Maple Street, on the west by Pine Street[,] and on the east by South Union Street" as indicated by Ordinance Map 5.2A. See Ordinance § 5.2.6(b)(4). Therefore, Springlet's application to convert an existing non-residential property to a residential use is entitled to a density not to exceed 92 units per acre, so long as it can secure conditional use approval and meets the §§ 5.2.6(b)(4)(A)–(H) criteria. Id. Springlet's application was denied for failing to meet three of those criteria, and Springlet has sought review of whether its application meets those criteria in this appeal. See generally DRB Decision at 12 (denying Springlet's application for failure to meet three RH District adaptive reuse criteria).

Under Article 5, residential density in the RH District is generally limited to 40 units per acre. See Ordinance § 5.2.1 and Ordinance Table 5-B. However, adaptive reuses in this portion of the RH District may qualify for increased density maximums, provided that the adaptive reuse meets additional criteria related to, among other things, building height, exterior building materials, structured parking concealment, and the project's impact on the character of its surrounding area. See Ordinance §§ 5.2.6(b)(4)(A)-(H). Questions 2, 3, and 4 ask whether Springlet's application satisfies certain of those additional criteria. Therefore, our determination of whether Springlet's application is entitled to the 92-unit-per-acre density maximum—and therefore meets the Article 5 density requirements—depends on whether the application meets the additional criteria that are the subject of Questions 2, 3, and 4. Therefore, before we resolve Question 1, we must resolve these other Questions. But for purposes of clarifying the legal issues outstanding in Appellant's Question 1, we conclude that for purposes of determining a project's density for purposes of Ordinance Article 5, the Ordinance requires a computation of

10

density based upon the number of residential units on an entire lot, even if the development is only proposed for a small portion of that lot.

**Question 2: Exterior Building Materials**

Springlet's Question 2 asks whether the exterior building materials proposed for its PRD project are "quality masonry" or "of similar durability." The Ordinance provides that "[a]ny new structure utilizing the height bonus provisions as specified under [§ 5.2.6(b)(4)] shall be constructed of quality masonry materials or other comparable materials of similar durability on all elevations." Ordinance § 5.2.6(b)(4)(D). As a preliminary matter, we note that Springlet's application proposes a structure that ranges in height from 55 feet to 61.5 feet, which is in excess of the height generally permitted in the RH District. See Ordinance § 5.3.1 and Ordinance Table 5-C (setting a maximum height of 35 feet).

We presume, as the parties do, that Springlet's application seeks authority to make use of the provision allowing additional building height found in Ordinance § 5.2.6(b)(4)(A), and that the "quality masonry materials or comparable materials of similar durability" requirement is applicable here.

Springlet proposes to employ eight inch by eight inch CMU blocks in the structure's front façade and portions of the structure's side elevations. The proposed structure's exterior will also include the seven-foot high concrete slabs that Springlet proposes for portions of the structured parking area. In addition, Springlet's proposal calls for the incorporation of factory-finished metal siding.

Springlet has submitted the affidavit of its architect, Michelle Dufresne, in support of its assertion that the CMU blocks and factory-finished metal siding are materials comparable in durability to quality masonry. See Aff. of Michelle Dufresne at ¶¶ 7-9 (explaining that CMU blocks are a "very durable quality masonry material" and that "factory-finished metal cladding, when properly installed, is even more durable than masonry"). Springlet has also submitted promotional materials that describe the versatility, aesthetics, and economics of CMU blocks. Attach. D to Aff. of Ross Feldmann, Esq. The City has submitted the affidavit of its architect, Ann Vivian, in support of its contention that CMU blocks are not quality masonry and that factory-finished metal siding is not as durable a building material as that required by the Ordinance.

11

Section 5.2.6(b)(4)(D) focuses on the durability of materials to be used in the construction of adaptive reuses that qualify for a height bonus under § 5.2.6(b)(4)(A). It requires that an applicant either use "quality masonry" or something of similar durability. The Ordinance provides no other guidance on this issue, and thus we must apply the Ordinance according to its plain meaning. "Masonry" is defined as "stonework or brickwork." Webster's II New College Dictionary 689 (3rd ed. 2005). "Quality" is defined as "superiority of kind" or a "degree or grade of excellence." Id. at 926. Thus, Springlet must either propose to construct its development of superior stonework or brickwork, or it must construct its development with materials that have the same durability of superior stonework or brickwork.

Springlet does not propose to use stone or brick in its development. Instead, it proposes to use CMU blocks. It supports its assertion that these CMU blocks are similar in durability to superior stonework or brickwork through its architect's affidavit, who asserts plainly that "[c]oncrete is a very durable material," that CMU blocks are "a very durable quality masonry material." Dufresne Aff. at ¶¶ 6–9. Ms. Dufresne continues with a representation that, in her professional opinion, Springlet's proposed project will be "using either quality masonry materials [or] comparable materials of similar durability[,]" and that properly installed factory-finished metal cladding as suggested by the City Design Advisory Board "is even more durable than masonry." Id. at ¶¶ 8–9.

Affidavits in support of summary judgment must "be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence . . . ." V.R.C.P. 56(e). The affidavit of Springlet's architect does not set forth specific facts explaining why CMU blocks are sufficiently durable. A party may rely on expert opinions in Rule 56 affidavits, but the affidavits may not merely state conclusions; instead an expert's affidavit must "present specific facts[.]" Morais v. Yee, 162 Vt. 366, 371–72 (1994). In Morais, the plaintiffs attempted to use their expert's conclusory statements to oppose a motion for summary judgment. Id. at 371. The Supreme Court held[8] that these conclusory statements failed to raise an issue of material fact because the statements were not supported by specific facts or "any indication of how the opinion was formulated." Id. at 372; see Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19,

---

[8] While Morais was decided in the context of affidavits opposing summary judgment, the reasoning applies with equal force here, where Springlet bears the burden of demonstrating that it is entitled to judgment as a matter of law and where the City will be afforded the benefit of all reasonable doubts and inferences. See Mooney v. Town of Stowe, 2008 VT 19, ¶ 5 (mem.).

25 (2nd Cir. 1994) (noting an affidavit stating the facts upon which an expert's opinion is based satisfies the analogous Federal Rule 56(e)); see also Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.").

In effect, the affidavit given in support of Springlet's summary judgment motion does little more than restate the allegations and assertions made it its memoranda, a tactic that the Morais Court found insufficient. See also Field v. Costa, 2008 VT 75, ¶ 14. Accordingly, we must conclude that Springlet has not yet established the material facts necessary to fulfill the extra-ordinary burden needed to allow judgment to summarily be entered in its favor at this time. We must therefore **DECLINE** to grant its motion for judgment on its Question 2.

## Question 3: Structured Parking Concealment

The Ordinance provides that "[a]ny structured parking shall be concealed by the structure of the building so that it is not visible from the street," though "the entrance and exit may be visible." Ordinance § 5.2.6(b)(4)(E)(4). Springlet has proposed to construct a concrete screening wall seven feet tall in front of the southerly side of its development which Springlet asserts will conceal the structured parking. Springlet also represents that the structured parking would be concealed in part by a "central vertical building element." Dufresne Aff. at ¶ 12. As Springlet's application materials demonstrate, St. Paul Street would lie easterly of the proposed development, as would the entrance and exit of the structured parking.

Springlet's architect asserts that they have attempted to conceal the structured parking as best as possible and "in accordance with DRB suggestions." Id. The City does not appear to specifically contradict Springlet's suggestion that its design proposes to conceal the structured parking "as best as possible." However, this is not the concealment standard contained in § 5.2.6(b)(4)(E)(4), which requires that structured parking not be visible from the street. Springlet has not demonstrated that a seven-foot wall on some but not all sides facing the street, even with a central building element, will eliminate views of the structured parking from the street. Therefore, we must decline to enter judgment as a matter of law on Springlet's behalf as to its Question 3.

## Question 4: Character of the Area Affected

The Zoning Ordinance provides that "[w]hen the DRB [and this Court on appeal] reviews a project requested under [§] 5.2.6(b)(4) for compliance with [§] 17.1.5(a)(2) (Character of the

Area Affected), it shall take into consideration the fact that developments utilizing this bonus are located in an area adjacent to the Central Business District." Ordinance § 5.2.6(b)(4)(H).

Section 17.1.5(a)(2) provides that approval of a proposed development may only be granted upon a determination that it will not "adversely affect . . . the character of the area affected . . . ." When making determinations regarding the impact upon the character of the area affected, the Ordinance provides the further direction to the DRB in the first instance and this Court on appeal to "consider that it is the public policy of the City of Burlington that where there are conflicts between public uses and activities and the quiet enjoyment of residents in developments utilizing the bonuses in [§] 5.2.6(b)(4), the public uses and activities shall take precedence and the development shall be designed in a matter that mitigates the conflicts." Ordinance § 5.2.6(b)(4)(H). The "adverse affect test must be applied reasonably to prohibit only substantial and material adverse effects." Id.

The Zoning Ordinance provides no definition of the term "area affected" as used in § 17.1.5(a)(2). However, we are not without statutory guidance. Section 17.1.5(a)(2) is titled "Conditional uses" and authorizes approval of some uses after notice, hearing, and findings by the DRB (or this Court on appeal) that the proposed use meets certain criteria. Municipalities may adopt conditional use regulations pursuant to 24 V.S.A. § 4414(a)(3). These statutory conditional use criteria have regulatory effect even if a municipality fails to specifically incorporate them into its zoning bylaws. See In re Geddes 9-Lot Subdivision, No. 101-5-07 Vtec, slip op. at 12 (Vt. Envtl. Ct. Aug. 22, 2008) (Wright, J.) (collecting cases).

Section 4414(a)(3)(A)(ii) of Title 24 explains that the term "area affected" is "defined by the purpose or purposes of the zoning district within which the project is located, and specifically stated policies and standards of the municipal plan."

Thus, in this de novo appeal, we are directed to determine whether Springlet's proposed development would have a substantial and material adverse effect on the RH District, with reference to the purposes of that district, specifically stated policies and standards of the municipal plan, and with consideration that this district lies adjacent to the Central Business District.

As the Ordinance explains "[t]he RH district is intended primarily for high density residential development in the form of duplexes, apartments, and/or [PRDs]." See § 3.1.4(c). All residential districts are "intended to secure for [those] who reside [in them] a comfortable,

14

healthy, safe, and pleasant environmental in which to live, sheltered from incompatible and disruptive activities that properly belong in nonresidential districts." § 3.1.4. In addition, "[c]ertain nonresidential uses, including public and semi-public uses and neighborhood-oriented commercial and service uses, are permitted in certain residential districts upon conditional use approval." Id. A copy of the applicable municipal plan has not yet been submitted to us; we therefore limit our analysis to the applicable Ordinance provisions, cited above.

Viewing the evidence presented in a light most favorable to the City, as we must when considering Springlet's application and motion, we note that the proposed project has many facets that will be unique to its immediate neighborhood and zoning district. No other building on adjoining properties is nearly as tall as the proposed new structure. The exterior materials to be employed on Springlet's PRD do not mimic the materials employed on adjacent existing buildings. While a final determination after all evidence is received at trial may result in an opposite determination, we cannot conclude on the record now before us, particularly when showing the necessary deference to the City, as the non-moving party, that Springlet's project will not have an adverse affect on its immediate neighborhood or zoning district. Accordingly, we must **DENY** Springlet's summary judgment request as to Question 4.

We note also that because we have denied Springlet summary judgment on Questions 2, 3, and 4, we must also deny Springlet summary judgment on Question 1. As discussed above, Springlet's density request is predicated upon its project meeting the conditions found in Ordinance §§ 5.2.6(b)(4)(A)–(H). Because we have concluded that the record presently before us prohibits the entry of summary judgment for Springlet as to Questions 2, 3 and 4, we must **DENY** Springlet's summary judgment request as to Question 1 as well.

## Question 5: Front Yard Setback Requirements

We turn last to Springlet's request for summary judgment as to its Question 5, which asks whether the proposed project satisfies the requirement of Ordinance § 5.3.13(c)(2) that "the depth [of the front yard shall be] increased five (5) feet for each additional ten (10) feet of building height" the application requests over the district height limitations.

The parties dispute the applicability of § 5.3.13(c)(2) to Springlet's application. Springlet contends that because the section governing adaptive reuse exceptions to maximum density contains a subsection regarding setbacks, that the adaptive reuse setback provision should apply to the exclusion of § 5.3.13(c)(2). See § 5.2.6(b)(4)(B) (containing setback requirement

15

necessary for securing maximum density exception for adaptive reuses in the RH District). The City contends that § 5.3.13(c)(2) is a more restrictive provision than § 5.2.6(b)(4)(B), and therefore must be applied to Springlet's application. See Ordinance § 1.1.9 ("Where one provision of this ordinance conflicts with another provision within this ordinance, the more restrictive shall apply unless otherwise specified.").

Further complicating the legal issue of applicable setback minimums is Springlet's assertion, apparently uncontested, that the existing commercial structure is without setback, which constitutes a lawful, pre-existing, non-complying structure under the current Zoning Ordinance. See Ordinance § 30.1.2 (defining "non-comply structure" as "a structure or part thereof not in conformance with zoning regulations covering . . . yards . . . where such structure conformed to all applicable laws, ordinances and regulations prior to enactment of such zoning ordinance"). Springlet appears to argue that because its pre-existing commercial structure does not comply with the applicable setback requirements, it should be allowed to construct a new PRD structure that is non-compliant also.

This is a novel legal argument, the foundation for which Springlet does not offer and for which we are not privy. We decline to grant summary judgment on this basis. See Ordinance § 20.1.7 (stating that no "new noncompliance" nor "increase of the degree" of a pre-existing nonconformity is allowed in connection with the use, maintenance and enjoyment of a lawful, pre-existing non-conforming structure or related parking). We regard the addition of a new structure that mimics a non-conforming setback (or lack thereof) of a pre-existing building to be the very type of activity prohibited by § 20.1.7 in particular and zoning regulations in general.

In our analysis of the competing setback provisions (Ordinance §§ 5.2.6(b)(4)(B) and 5.3.13(c)(2)) we do not see the conflict the parties' legal arguments presume. Subsection (1) of § 5.2.6(b)(4)(B) speaks to necessary setbacks "from adjacent residential structures," which denote a measurement not called for in either § 5.3.13(c)(2) or the general provisions for setbacks required in the RH District, found in Tables 5-C and 5-D, and Ordinance § 5.3.5 (all of which speak to setbacks from the front, side or rear yard, not adjacent buildings).

Subsection (2) of § 5.2.6(b)(4)(B) appears to impose increases in the setback requirements for structures, such as Springlet's, that seek to exceed the general height restrictions, as allowed by § 5.2.6(b)(4). Thus, we conclude that Springlet's proposed structure must be shown to respect both the setback from adjoining structures (under § 5.2.6(b)(4)(B)) and

16

from the front, side and rear boundaries of its own lot. Based upon the record now before us, we cannot see that Springlet has put forth sufficient uncontested material facts on these legal issues. We therefore must **DECLINE** to render summary judgment in Springlet's favor as to its Question 5.

### Conclusion

Accordingly, for all the forgoing reasons, it is **ORDERED** and **ADJUDGED** that Springlet's Motion for Summary Judgment is **DENIED** on Questions 1, 2, 3, 4, and 5.

The Court directs the parties to confer within the next 45 days and thereafter advise the Court of an agreed-upon final Scheduling Order for trial. In the event the parties are unable to submit a stipulated Scheduling order to the Court before **Friday, January 16, 2009**, the Court shall set this matter for a pre-trial telephone conference with the Case Manager.


Done at Berlin, Vermont this 9th day of December, 2008.


_____

Thomas S. Durkin, Environmental Judge